IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 14-cv-01235-LTB

THERESA R. LONGMORE,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.

_____

**ORDER**

_____

      Theresa R. Longmore appeals the final decision of Acting Commissioner of Social Security Carolyn W. Colvin ("SSA") denying her application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*  I have considered the parties' briefs [Docs. # 17, 20, 21] and the administrative record [Doc. # 14] ("AR").  Oral argument would not materially assist me in determining this appeal.

      Ms. Longmore contends that the administrative law judge ("ALJ") erred by (1) failing to properly analyze whether she meets or equals a listed impairment at step three of SSA's sequential process for evaluating disability; (2) failing to properly evaluate her treating physician's opinions; (3) improperly assessing her residual functional capacity at step four; and (4) concluding at step five that she could perform jobs that exist in significant numbers in the national economy.  While I agree that the ALJ's discussion at step three was inadequate, her analysis at step four leads me to conclude that the error was harmless.  The other arguments are without merit.  Accordingly, I **AFFIRM**.

# I.  Background

## A.  Procedural History

Ms. Longmore filed her claim with SSA on April 28, 2009, alleging disability beginning October 3, 2008.  AR 11.  SSA denied her claim initially on May 4, 2010.  *Id.*  Ms. Longmore requested a hearing.  *Id.*  The hearing took place on May 19, 2011, before an ALJ.  *Id.*  On July 27, 2011, the ALJ denied Ms. Longmore's claim, concluding that Ms. Longmore was not disabled within the meaning of the Social Security Act.  AR 18.  Ms. Longmore appealed to the Appeals Council, which denied review, and then to this Court.  AR 1.  On May 13, 2013, the Court reversed the ALJ's decision and remanded the case for "further proceedings at Step 2, and if appropriate, Steps 3, 4, and 5" of SSA's sequential evaluation process, concluding that the ALJ "fail[ed] to consider all the medical evidence related to the functional limitations caused by Ms. Longmore's vocal cord dysfunction."  Opinion & Order at 8-9 [Doc. # 20], Case No. 12-cv-00593-MSK.

On remand, the ALJ conducted a second hearing, which took place on November 19, 2013.  AR 814.  On January 9, 2014, the ALJ again concluded that Ms. Longmore was not disabled and denied her claim.  AR 822.  On January 29, 2014, Ms. Longmore sought review by the Appeals Council.  AR 803.  On April 30, 2014, while her exceptions before the Appeals Council were still pending, she filed this action.  The Appeals Council subsequently allowed her to withdraw her exceptions and proceed with this action.  AR 800.  The Court has jurisdiction. *See* 42 U.S.C. § 405(g) (claimant "may obtain a review of [SSA's] decision by a civil action commenced within sixty days after the mailing to him of notice of [SSA's] decision or within such further time as [SSA] may allow"); 20 C.F.R. § 404.984 (claimant generally need not seek

Appeals Council review before seeking judicial review where case was previously remanded by a court).

## B. Facts

### 1. Relevant Medical History

In October 2008, Ms. Longmore took a medical leave of absence from her job, which required her to "talk[] on the phone all day," due to hoarseness from a sinus infection. AR 241-49, 267-69. John Cichon, M.D., her otolaryngologist, referred her to a speech language pathologist. AR 246. She attended 23 sessions of speech therapy from December 2008 to March 2009. AR 357. Upon discharging Ms. Longmore from therapy, speech pathologist Jacy Doumas, M.S., assessed voice disorder. AR 357-58. She advised Ms. Longmore to "follow best practices for voice quality, use, endurance, [and] hygiene" and noted that Ms. Longmore "needs to be aware of environments/medical conditions that worsen voice [and] avoid these." *Id.*

In March 2009, Ms. Longmore saw her primary care doctor, Anthony Vecchiarelli, M.D., and reported that "her blood pressure has been gradually climbing over the past month." AR 257. He assessed a marked increase in hypertension and prescribed Benicar in addition to the metoprolol and triamterine she was already taking. *Id.* That same month, Ms. Longmore returned to Dr. Cichon with complaints of sinus problems. AR 239. Dr. Cichon noted that a computed tomography ("CT") scan of her sinuses did not show significant sinusitis. AR 240. He recommended that she continue using nasal steroid sprays. *Id.*

In April 2009, Ms. Longmore complained to Dr. Vecchiarelli of chronic numbness in both hands that had been gradually worsening over the past three years. AR 524. She said the numbness was worse when she woke up in the morning but gradually got better after about an

hour.  *Id.*  She also noted that she had experienced stiffness in her neck and numbness in both feet for the past three weeks.  *Id.*  The doctor conducted a physical examination and concluded that the numbness was not radicular, *i.e.,* caused by nerve root compression, but could be peripheral, *i.e.,* caused by damage to peripheral nerves.  *Id.*

In November 2009, Ms. Longmore saw Randall Bjork, M.D., at Colorado Springs Neurosurgery with complaints of numbness and tingling in all extremities.  AR 414.  She reported she had dropped a bowl of oatmeal in her lap.  *Id.*  Dr. Bjork assessed fibromyalgia and ordered a magnetic resonance imaging scan ("MRI") of her cervical spine.  *Id.*  The MRI showed "several dis[c] abnormalities," including a "broad-based" disc herniation at the C5-C6 level that "could potentially affect" the C6 nerve root.  AR 316.  The MRI also showed annular tearing at the C4-C5 level.  AR 315.

In December 2009, Ms. Longmore received Botox injections for her neck and shoulder pain but told Dr. Vecchiarelli that they did not provide any significant relief.  AR 410, 505.  She also complained of trouble sleeping.  AR 505.  Dr. Vecchiarelli noted that he did not believe that her neck or shoulder pain was due to cervical disc disease.  *Id.*  He noted that numbness in her extremities "could be related to her cervical spine but it's probably more related to her somatoform disorder."  *Id.*  He prescribed Savella, an antidepressant that is approved to treat fibromyalgia.  *Id.*  At appointments in early 2010, Ms. Longmore told Dr. Vecchiarelli that the Savella did not relieve her fibromyalgia symptoms or insomnia, although it did help with her irritable bowel syndrome ("IBS") and headaches.  AR 486, 499, 501, 1239.  In March 2010, Ms. Longmore underwent an electromyogram ("EMG").  AR 379.  The results were normal, with no electrodiagnostic evidence of peripheral nervous system dysfunction.  *Id.*

In April 2010, Carolyn Senavsky, M.D., examined Ms. Longmore in connection with the instant disability claim. AR 394. Ms. Longmore reported experiencing "complete and total body aches" that are constant and worsened by prolonged sitting or standing, but improved by Vicodin. *Id.* She stated that she had experienced body aches her whole life and was diagnosed with fibromyalgia in 2001. *Id.* She stated that her symptoms had not changed since her 2001 diagnosis. *Id.* She also reported having back and neck problems since she was a child and sinus problems since she was 18 years old. *Id.* Ms. Longmore reported being able to get out of bed, dress, bathe, cook, and clean. AR 395. She said she typically spends her day reading, watching television, playing with her cat, doing laundry, washing dishes, making jewelry, and using the computer. *Id.* She also reported using the treadmill and doing physical therapy for 20 minutes per day. AR 396.

On examination, Ms. Longmore was "somewhat uncomfortable" getting on and off the examination table and had difficulty bending over to remove her shoes. AR 397. She "was able to arise spontaneously and unaided from a seated position, although she seemed to be a little bit uncomfortable." *Id.* She had a normal gait; full strength in her arms and legs; and normal ranges of motion of her neck and low back with no discomfort. AR 398-99. Dr. Senavsky noted no tenderness to palpation of the cervical spine, but did note thoracic, lumbar, and sacral tenderness to palpation. AR 399. Dr. Senavsky wrote that her "findings were commensurate with complaints." AR 397. She assessed fibromyalgia, noting that Ms. Longmore had "15 of 18 positive trigger points and no controls or referral pain." AR 399. She also assessed back pain, noting that there was a "[h]igh clinical suspicion of myofascial strain." AR 400. In addition, she assessed hoarseness, hypertension, and sinus infections. AR 399-400. In regard to functional

limitations, she noted that Ms. Longmore could stand and walk 3 to 4 hours in an 8-hour workday with breaks every 30 to 45 minutes; sit 6 to 8 hours with breaks every 45 to 60 minutes; and lift or carry 15 pounds frequently and 20 pounds occasionally, but would have difficulty with frequent bending, stooping, squatting, crouching, and crawling.  AR 399-400.

In June 2010, Ms. Longmore returned to Dr. Bjork, who noted that she had experienced a "nice response to Savella with her fibromyalgia," contrary to her reports to Dr. Vecchiarelli earlier in the year.  AR 407.  Dr. Bjork noted that her "chronic pain seems improved."  AR 408. He added that Ms. Longmore had "fibrofog," however, which are cognitive or memory problems associated with fibromyalgia.  AR 407.

In July 2010, Dr. Vecchiarelli completed a form in which he provided opinions regarding Ms. Longmore's fibromyalgia.  AR 425-27.  He opined that she suffered from widespread pain that had been present for at least 3 months; that she consistently exhibited pain in at least 11 of the 18 tender point sites consistent with fibromyalgia; that she suffered from morning stiffness and/or stiffness after sitting for a short period of time; that her sleep was affected; and that she suffered from fatigue of sufficient severity and persistence to interfere significantly with a full-time workday.  AR 425.  Dr. Vecchiarelli further opined that Ms. Longmore could sit for only one hour and "stand/walk" for only one hour during an eight-hour day, and that she would need to alternate sitting and standing at will throughout the day.  AR 426.  He noted that she could frequently lift up to 10 pounds, could occasionally lift 10 to 19 pounds, could rarely lift 19 to 49 pounds, and could never lift 50 or more pounds.  *Id.*  Finally, he noted that she could use her hands to perform simple grasping, pushing, pulling, and fine manipulation, but could not use her hands for activities involving repetitive motion.  *Id.*

In November 2010, Dr. Vecchiarelli noted that Ms. Longmore had stopped taking her Savella even though she "definitely feels it was helping with both her IBS and her fibromyalgia." AR 1223.  Ms. Longmore stated that, since discontinuing Savella, her problems with insomnia, muscle pain, diarrhea, and abdominal pain had worsened.  *Id.*  The doctor directed her to start taking her Savella again.  *Id.*

In January 2011, Ms. Longmore reported worsening insomnia and back pain, although Dr. Vecchiarelli noted she had not had any true paresthesias.  AR 1212.  He ordered imaging studies.  AR 1211.  An x-ray of her thoracic spine showed mild disc space narrowing and minimal spondylosis at most levels as well as possible mild degenerative changes of the cervical spine.  AR 1214.  An MRI of her lumbar spine showed mild multilevel facet arthropathy with some minimal disc disease at the L4-S1 level, but no central canal or neural foraminal narrowing.  AR 1215.

In March 2011, Ms. Longmore presented to Dr. Vecchiarelli with complaints of sinus problems and trouble sleeping.  AR 1208.  During the rest of 2011 and early 2012, Ms. Longmore saw Dr. Vecchiarelli primarily for sinus and allergy issues and hypertension and anticoagulation therapy.  AR 1274-87, 1290, 1417-20.  In January 2012, she complained that her entire spine had been painful for two weeks and that she had worsening numbness in both hands. AR 1283.  In June 2012, she complained of worsening neck pain and intermittent numbness in both hands.  AR 1414.

In August 2012, Ms. Longmore began receiving additional speech therapy with Ms. Doumas at Dr. Vecchiarelli's request.  AR 1346, 1364.  Ms. Doumas assessed hoarseness, dysphonia, poor breath support, gravel voice, and vocal fatigue.  AR 1365-66.  Ms. Doumas

opined that Ms. Longmore could rarely (*i.e.,* for one to five percent of an eight-hour workday) speak clearly in a competitive work situation and that she had been unable to do so since January 10, 2006.  AR 1346.  Ms. Longmore continued to receive therapy with Ms. Doumas through November 2012.  AR 1367-96.  At that time, Ms. Doumas noted that Ms. Longmore did not always follow best practices for vocal hygiene because of her passion for choir and her love of talking.  AR 1382.

In September 2012, Ms. Longmore saw Dr. Vecchiarelli and reported that the Savella was working well for her IBS and fibromyalgia and that she was sleeping well with Ambien. AR 1410.  In May 2013, Ms. Longmore complained of pain throughout her entire spine, as well as numbness in her hands when making reaching or grasping motions.  AR 1516.  She reported dropping objects.  *Id.*  On examination, the doctor noted that she had decreased sensation in her right median nerve distribution and that her back was moderately tender over the entire thoracic spine with only minimal muscular tenderness.  *Id.*  He noted markedly diminished range of motion of the thoracic and lumbar spine.  *Id.*

Dr. Vecchiarelli ordered an x-ray of Ms. Longmore's thoracic spine, which showed mild disc narrowing and spondylosis at most levels.  AR 1427.  An MRI of her cervical spine showed "severe" neuroforaminal narrowing at the left C5-C6 level.  AR 1429.  An x-ray of her cervical spine showed multilevel degenerative changes with degenerative retrolisthesis at the C4-C5 and C5-C6 levels.  AR 1432.  Dr. Vecchiarelli also sent Ms. Longmore to physical therapy.  Ms. Longmore reported that her back was somewhat better with therapy but that she continued to experience weakness and numbness in her arms.  AR 1510-12.  Later in May 2013, Dr. Vecchiarelli wrote an opinion stating that, since October 2008, Ms. Longmore had been unable

8

to use her hands or arms for any portion of an 8-hour workday; had been able to use her fingers for only 10 percent of the workday; had been able to lift up to 10 pounds occasionally; and had been unable to lift more than 10 pounds.  AR 1428.

In July 2013, Ms. Longmore saw Steven Murk, M.D., of Colorado Springs Neurological Associates.  Dr. Murk noted that, while the recent MRI scan had been read to show "severe" neuroforaminal narrowing at the left C5-C6 level, he would not necessarily use the "severe" descriptor.  AR 1439.  While Ms. Longmore complained of losing feeling in her left hand, Dr. Murk noted that her pain history "does not localize to a particular nerve root distribution on the left" and "lacks many of the important features of a radiculopathy."  *Id.*  He added that "there is nothing that localizes into the C6 distribution as far as her complaints" and that the "only neurologic finding is a mild reflex asymmetry."  *Id.*  On examination, Dr. Murk noted that Ms. Longmore did not show a marked decrease in her range of motion.  AR 1440.  He referred her for an EMG and nerve conduction study.  The study was normal, with no evidence of radiculopathy, plexopathy, or neuropathy.  AR 1438.

### 2. Hearing Testimony

At the 2011 hearing, Ms. Longmore testified that she could sit for 1 to 2 hours at a time, stand for 15 minutes at a time, and lift 10 pounds easily.  AR 28-29, 41.  She testified that "sometimes [her] hands don't want to work," which can prevent her from picking things up and cause her to drop things.  AR 29, 43.  She testified that "the thing that would keep [her] from working" was her "fatigue."  AR 46.  In regard to activities, she testified that she watches television, reads, drives, makes jewelry, spends time on the computer, does physical therapy, and goes to church each week.  AR 30-32.  In regard to household chores, she does laundry, goes to

the grocery store with her husband, dusts and straightens up the house occasionally, keeps the kitchen clean, does dishes, and fixes meals.  AR 39-40.  Ms. Longmore said that she experiences a "bad day" two or three times a week.  AR 41-42.  On a bad day, she will eat breakfast, shower, and then stay in bed all day reading and watching TV.  *Id.*  Two or three days a week are "good days," however, during which she wakes up, showers, and uses "the computer for a couple of hours before [she has] to go and lie down."  AR 42.

At the 2013 hearing following the Court's remand, Ms. Longmore testified that there are times when her voice cannot be heard at all.  AR 840.  She said her voice was usually worse in the morning and when she was exposed to solvents, fumes, and gases.  AR 841.  She stated that her conditions had worsened since the first hearing.  AR 843.  She explained that she was "getting pinched nerves going down to [her] left hand now as a result of the vertebrae [in her neck] having shifted farther out of alignment."  *Id.*  She noted that her medications affected her ability to concentrate and made her sleepy but stated that she did not nap during the day. AR 842.  She noted that she sang in the church choir until May 2013.  AR 840.  A vocational expert ("VE") testified at the hearing.  She testified that an individual with Ms. Longmore's residual functional capacity could work as an escort vehicle driver, clerical sorter, and document preparer, and that there were, respectively, 19,359, 48,155, and 45,013 such jobs in the national economy.  AR 850-51.

## II.  Legal Standards

### A.  SSA's Five-Step Process for Determining Whether a Claimant Is "Disabled"

A claimant is "disabled" under Title II of the Social Security Act if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  SSA has established the following five-step sequential evaluation process for determining whether a claimant is disabled and thus entitled to benefits.  20 C.F.R. § 404.1520.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity."  If she is, benefits are denied and the inquiry stops.  *Id.* § 404.1520(b).  At step two, SSA asks whether the claimant has a "severe impairment"—that is, an impairment or combination of impairments that "significantly limits [her] physical or mental ability to do basic work activities."  *Id.* § 404.1520(c).  If she does not, benefits are denied and the inquiry stops.  If she does, SSA moves on to step three, where it determines whether the claimant's impairment(s) "meet or equal" one of the "listed impairments"—impairments so severe that SSA has determined that a claimant who has them is conclusively disabled without regard to the claimant's age, education, or work experience.  *Id.* § 404.1520(d).  If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity ("RFC"), *i.e.,* what she is still able to do despite her impairments, and asks whether the claimant can do any of her "past relevant work" given that RFC.  *Id.* § 404.1520(e).  If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows her to do other work in the national economy in view of her age, education, and work experience. *Id.* § 404.1520(g).  At this step, SSA's "grid rules" may mandate a finding of disabled or not disabled without further analysis based on the claimant's age, education, and work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2.  In contrast with step five, the claimant has "the burden of

establishing a prima facie case of disability at steps one through four." *Doyal v. Barnhart*, 331

F.3d 758, 760 (10th Cir. 2003).

**B.  Standard for Reviewing SSA's Decision**

My review is limited to determining whether SSA applied the correct legal standards and

whether its decision is supported by substantial evidence in the record. *Williamson v. Barnhart*,

350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001);

*Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).  With regard to the law, reversal may be

appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance

on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

With regard to the evidence, I must "determine whether the findings of fact . . . are based upon

substantial evidence, and inferences reasonably drawn therefrom.  If they are so supported, they

are conclusive upon [this] court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d

1149, 1150 (10th Cir. 1970).  "Substantial evidence is more than a scintilla, but less than a

preponderance; it is such evidence that a reasonable mind might accept to support the

conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v.

Perales*, 402 U.S. 389, 401 (1971)).  The record must demonstrate that the ALJ considered all of

the evidence, but an ALJ is not required to discuss every piece of evidence.  *Clifton v. Chater*, 79

F.3d 1007, 1009-10 (10th Cir. 1996).  I may not re-weigh the evidence or substitute my

judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799,

800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v.

Califano*, 638 F.2d 219, 220 (10th Cir. 1981).

### III.  The ALJ's Decision

The ALJ followed the five-step analysis outlined above.  At step one, the ALJ found that

Ms. Longmore has not engaged in substantial gainful activity since the alleged onset date of her

conditions, October 3, 2008.  AR 816.  At step two, the ALJ found the following severe

impairments: "fibromyalgia; insomnia; scoliosis and degenerative changes of the spine; chronic

sinusitis; history of deep vein thrombosis; [and] vocal cord dysfunction."  *Id.*  At step three, the

ALJ concluded that Ms. Longmore did not meet or equal any of the listed impairments.  AR 817.

At step four, the ALJ found as follows:

> [T]he claimant has the residual functional capacity to: lift or carry
> 10 pounds frequently and occasionally; stand or walk a total of two
> hours and sit a total of six hours in an eight-hour workday; and
> perform pushing and pulling motions with her upper and lower
> extremities within the aforementioned weight restrictions.  The
> claimant: should avoid unprotected heights and moving machinery;
> should be restricted to a 'relatively clean' work environment,
> meaning low levels of pollutants; can occasionally climb stair[s]
> and ramps, stoop, crouch and kneel, but cannot climb ladders,
> ropes or scaffolds; should avoid crawling; can occasionally reach
> overhead bilaterally; should avoid working with sharp objects like
> kitchen knives, due to use of blood thinners; and should limit
> conversation or singing to one hour at a time or be afforded
> frequent breaks during conversation or singing.

AR 817-21.  The ALJ determined that this RFC did not allow Ms. Longmore to perform any of

her past relevant work.  AR 821.  At step five, the ALJ concluded that, considering Ms.

Longmore's age, education, work experience, and RFC, she could perform jobs that exist in

significant numbers in the national economy, including the representative jobs of escort vehicle

driver, sorter, and document preparer.  AR 821-22.  Based on this conclusion, the ALJ

determined that Ms. Longmore was not disabled.  AR 822.  Ms. Longmore seeks an order

reversing the ALJ's decision and awarding her benefits or, alternatively, remanding the case for

a new hearing.  I address her arguments in turn.

## IV.  Analysis

### A.  The ALJ's Conclusions at Step Three

Ms. Longmore contends that the ALJ failed to properly evaluate whether she meets or medically equals a listed impairment.  She argues that the ALJ's three-sentence analysis of this issue was inadequate.  The ALJ wrote:

> The claimant's impairments have been considered individually and in combination.  However, the combined clinical findings from such impairments do not reach the level of severity contemplated in the Listings.  The evidence does not support the existence of an impairment that meets or equals the criteria found in any listing; therefore, disability cannot be established on the medical facts alone.

AR 817.  Ms. Longmore objects that the ALJ failed to specifically address whether she met Listing 1.04A, for disorders of the spine, and Listing 2.09, for loss of speech.  Ms. Longmore further argues that the ALJ's analysis of whether she equaled a listed impairment was deficient and that the ALJ should have employed a medical expert to opine on that issue.

An ALJ is required "to discuss the evidence and explain why [s]he found that [the claimant] was not disabled at step three."  *Clifton*, 79 F.3d at 1009.  The ALJ's analysis at step three is patently inadequate.  As the Tenth Circuit noted with regard to a step three analysis it found deficient, the "ALJ did not discuss the evidence or [her] reasons for determining that appellant was not disabled at step three, or even identify the relevant Listing or Listings; [she] merely stated a summary conclusion that appellant's impairments did not meet or equal any Listed Impairment."  *Id.*   I will not belabor this point, however, because it is not enough to show that the ALJ erred; Ms. Longmore must also show that the error was harmful.  *See, e.g., Jimenez*

*v. Astrue*, 385 F. App'x 785, 788 (10th Cir. 2010) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.") (internal quotations and citation omitted).  Here, the ALJ's analysis at step four and undisputed parts of the record demonstrate that no reasonable factfinder could have found that Ms. Longmore met or equaled a listed impairment.  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 735 (10th Cir. 2005) (error at step three is harmless where "[n]o reasonable factfinder could conclude," based on "findings at steps four and five" and "indisputable aspects of the medical record," that claimant met or medically equaled a listed impairment).

As the government notes, Ms. Longmore has provided little explanation for her contention that she meets or medically equals a listed impairment.  She has merely pasted numerous excerpts of medical records that she says "support[] the severity of" her conditions.  *See, e.g.,* Opening Br. at 7 [Doc. # 17].  She has bolded some of the language in those excerpts, but makes no attempt to connect the excerpts with the specific criteria of the listings.  Counsel for Ms. Longmore filed a similar brief in a case before another judge of this Court.  The Court commented that:

> [P]laintiff's counsel's practice of merely copying portions of the medical records verbatim into his brief and then suggesting, without explication, that they show error, is singularly unhelpful and nearly unreviewable.  This "just-so" approach does not substitute for an actual argument linking the evidence of record to any alleged errors in the ALJ's determination.  Counsel must actually present an argument describing how he believes the underlying evidence supports a contrary conclusion.

*Deegan v. Colvin*, No. 12-CV-01945-REB, 2013 WL 1827747, at *3 n.5 (D. Colo. Apr. 30, 2013).  These comments apply with equal force here.

It appears that this approach stems from a confusion of two different burdens.  Ms.

Longmore focuses on the ALJ's burden of identifying and analyzing relevant listed impairments at step three, which undoubtedly exists and, as I have stated, was not satisfied here.  On appeal, however, it is the claimant's burden to show that the ALJ's failure to provide a complete step three analysis was harmful.  That means she must show that her "alleged impairments satisfy the criteria of th[e] listing" that she allegedly meets or equals.  *Radabaugh v. Colvin*, No. 2:13-CV-202-PMW, 2015 WL 471614, at *3 (D. Utah Feb. 4, 2015).  Ms. Longmore essentially acknowledges that she did not carry this burden.  *See* Reply Br. at 2 [Doc. # 21] (arguing that her burden was merely to "produce objective evidence" and "identif[y] potential Listing categories," not to "explain how her medical evidence matched a listing").  Ms. Longmore's failure to meet this burden is reason enough to reject her argument.

In any event, the ALJ's findings at step four and undisputed evidence in the record preclude any reasonable factfinder from concluding that Ms. Longmore meets or equals the relevant listings.  I turn first to Listing 1.04A.  At step four, the ALJ noted that, despite Ms. Longmore's claims of numbness of the legs and hands, Dr. Vecchiarelli concluded that she had not had any true paresthesias.  AR 819.  Further, the ALJ noted that a July 2013 examination showed no marked decrease in Ms. Longmore's range of motion, full strength in the major muscle groups, normal musculoskeletal tone, and no atrophy, cyanosis, or clubbing.  *Id.*  To meet Listing 1.04A, a claimant must show, among other things, limitation of motion of the spine, motor loss, and sensory or reflex loss.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The ALJ's step four findings makes clear that Ms. Longmore does not meet these requirements.  Further, the medical records that Ms. Longmore has quoted do not provide any evidence of neuroanatomic distribution of pain, another requirement of this listing.  *Id.*

16

To meet Listing 2.09, a claimant must show "[l]oss of speech due to any cause, with inability to produce by any means speech that can be heard, understood, or sustained." *Id.* At step four, the ALJ noted that Dr. Cichon's examination in October 2008 revealed no abnormalities in the vocal folds, and further revealed that Ms. Longmore was inappropriately maintaining a wide glottis space, suggesting a psychogenic dysphonia. AR 818. The ALJ also noted that Ms. Longmore has frequently failed to follow best practices for vocal hygiene, but has experienced improvement when she has done so. *Id.* The ALJ further noted that Ms. Longmore went without speech therapy between 2009 and 2012. *Id.* In addition, medical records cited by Ms. Longmore suggest that, while she becomes "hoarse" or "strained" when she talks for extended periods, she is still generally able to be understood. *See, e.g.,* AR 1392, 1394. Such facts do not suggest a listing-level speech problem. *See Beauvoir v. Chater*, 104 F.3d 1432, 1434 (2d Cir. 1997) (claimant who could speak in "understandable whisper" did not meet Listing 2.09).

Ms. Longmore also contends that the ALJ should have considered whether her fibromyalgia or, alternatively, her combination of "fibromyalgia, insomnia, scoliosis, chronic sinusitis, history of deep vein thrombosis, vocal cord dysfunction, [and] cervical spine impairments" medically equals "Listing[s] 1.04A, 2.09 and/or 14.09D [for inflammatory arthritis] or any other listing of impairment." Opening Br. at 22 [Doc. # 17]. Ms. Longmore has not cited any medical evidence in support of this contention, much less explain how the evidence shows that she equals any listed impairment. *See Wall v. Astrue*, 561 F.3d 1048, 1065 (10th Cir. 1999) (declining to address argument that claimant medically equaled a listing where claimant "failed to support this contention with any developed argumentation") (internal quotations

17

omitted).  In any event, the ALJ's step four analysis reflects due consideration of all of Ms.

Longmore's impairments.  AR 817-21.  Ms. Longmore's argument that the ALJ should have

employed a medical expert to opine on this issue is similarly without merit.  While SSA

acknowledges that the ALJ's failure to do so "may be a technical error," Resp. Br. at 15 [Doc.

# 20], I agree that Ms. Longmore has not shown harm.  Because she has not identified anything

in the record that supports her argument that she medically equals a listed impairment, there is

no basis to conclude that obtaining a medical opinion would have served any useful purpose.

**B.  The ALJ's Consideration of Dr. Vecchiarelli's Opinions**

Ms. Longmore argues that the ALJ erred in discounting certain of Dr. Vecchiarelli's

opinions.  In particular, she points to a form he completed in July 2010 in which he indicated,

*inter alia*, that Ms. Longmore could sit for only one hour and "stand/walk" for only one hour

during an eight-hour day.  AR 425-27.  She further points to a form he completed in May 2013

indicating that, since 2008, she had been unable to use her hands or arms for any portion of an 8-

hour workday and could use her fingers for only 10 percent of the day.  AR 1428.  The ALJ gave

"little weight to the[se] check-form opinions" on the grounds that they are "not supported by

treatment notes and are not consistent with each other."  AR 820.

While "the opinion of a treating physician concerning the nature and extent of a

claimant's disability is entitled to controlling weight when it is well-supported by medically

acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other

substantial evidence in [the claimant's] case record . . . [a]n ALJ may disregard a treating

physician's opinion [where] it is not so supported."  *Doyal*, 331 F.3d at 762 (internal quotations

and citations omitted).  Here, the ALJ thoroughly explained why she found Dr. Vecchiarelli's

opinions lacking in support and in conflict with other evidence in the record.  She noted that the

doctor did not support the opinions he provided in the forms with any treatment notes.  She

further noted that his treatment notes contained observations inconsistent with the opinions,

including references to Ms. Longmore having a normal gait, a straight back with good flexibility,

and no difficulty ambulating.  AR 820.  Finally, the ALJ noted that the two forms were actually

inconsistent with one another:  The July 2010 opinion stated that Ms. Longmore could engage in

simple grasping, fine manipulation, and pushing/pulling.  AR 425-27.  But the May 2013 opinion

stated that Ms. Longmore had been unable to do those things since 2008.  AR 1428.

Specifically, it stated that, since her alleged onset date of October 3, 2008, she had been unable

to use her hands to grasp, turn, or twist objects, and had been unable to use her arms to reach.  *Id.*

Accordingly, the ALJ provided "specific, legitimate reasons" for discounting the opinions that

Dr. Vecchiarelli provided in the July 2010 and May 2013 forms.  *Langley v. Barnhart*, 373 F.3d

1116, 1119 (10th Cir. 2004).  She therefore did not err in doing so.

## C.  The ALJ's Assessment of Ms. Longmore's RFC

Ms. Longmore asserts that the ALJ's RFC determination at step four is not supported by

substantial evidence because the ALJ failed to address the "combined effect of Ms. Longmore's

impairments."  Opening Br. at 30 [Doc. # 17].  Ms. Longmore points to more than a dozen issues

reflected in the medical records, including vision problems, oral ulcers, skin rash, and bladder

spasms.  Some of the medical records Ms. Longmore cites provide no indication that these issues

are connected to her medically determinable impairments.  *See, e.g.,* AR 481 (noting skin rash

from "[p]robable insect bite").  In any event, an ALJ is not required to discuss every piece of

evidence so long as the record demonstrates that she considered all of the evidence.  *Clifton*, 79

F.3d at 1009-10.  The ALJ thoroughly discussed the medical evidence related to Ms. Longmore's impairments, including her fibromyalgia, in her several page analysis at step four.  I am therefore satisfied that the ALJ considered all of the evidence.

Ms. Longmore also contends that the ALJ did not give adequate consideration to her complaints, including of numbness and sensory loss in her hands and of drowsiness and difficulty concentrating caused by her medications.  The ALJ found that, while Ms. Longmore's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her statements about the intensity, persistence, and limiting effects of those symptoms were not entirely credible.  AR 818.  The ALJ noted that, while Ms. Longmore complained of pain, numbness, and tingling, objective examinations did not support her complaints.  AR 818-19.  For example, two EMG and nerve conduction studies were normal, showing no evidence of radiculopathy or neuropathy.  AR 379, 1438.  Further, as noted, a July 2013 examination showed no marked decrease in Ms. Longmore's range of motion, full strength in the major muscle groups, and normal musculoskeletal tone, among other findings.  AR 1439-42.  In addition, the ALJ noted that Ms. Longmore's daily activities—including performing personal care, preparing meals, driving, shopping, reading, and watching television—were inconsistent with her complaints.  AR 820.  Based on the foregoing, I conclude that the ALJ had a substantial basis for discounting Ms. Longmore's complaints.  *See White*, 287 F.3d at 909-10 (explaining that the "ALJ's credibility findings warrant particular deference" and should not be upset "[s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility"); *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (in determining credibility of pain testimony, the "nature of daily activities," among other factors, may be

considered).

**D.  The ALJ's Conclusions at Step Five**

Ms. Longmore makes two arguments regarding the ALJ's conclusions at step five.  First,

she argues that the ALJ relied on an incorrect RFC assessment in concluding that Ms. Longmore

can perform other jobs that exist in significant numbers in the national economy and, therefore,

that she is not disabled.  *See* 20 C.F.R. §§ 404.1520(g), 404.1560(c).  This argument depends on

a finding of error with respect to the RFC assessment.  Because I have rejected Ms. Longmore's

claims of error in that regard, this argument is without merit.  *See, e.g., Stubbs-Danielson v.*

*Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (rejecting argument that ALJ erred at step five

because claimant's argument "simply restates her argument that the ALJ's RFC finding did not

account for all her limitations").

Second, Ms. Longmore contends that the ALJ erred in failing to address whether the jobs

the ALJ found Ms. Longmore could perform at step five existed in "significant numbers" in the

national economy.  *See* 20 C.F.R. § 404.1560(c).  The VE testified that examples of jobs that

someone with the same, age, education, work experience, and RFC as Ms. Longmore could

perform included escort vehicle driver, sorter, and document preparer.  AR 850-51.  The VE

testified that there are 19,359 escort vehicle driver jobs, 48,155 sorter jobs, and 45,013 document

preparer jobs in the national economy—for a total of 112,527 jobs.  *Id.*  While the Tenth Circuit

has not "drawn a bright line establishing the number of jobs necessary to constitute a 'significant

number,'" *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992), it has held that no

reasonable factfinder could find that 152,000 jobs in the national economy was insignificant,

*Stokes v. Astrue*, 274 F. App'x 675, 684 (10th Cir. 2008).  *See also Knudson v. Astrue*, No.

10-CV-02905-PAB, 2012 WL 1079130, at *10 (D. Colo. Mar. 30, 2012) (concluding that 79,900 positions nationally combined with 1,194 positions locally was "more than a significant amount").  I therefore conclude that 112,527 was not "small enough to put the issue in a gray area requiring the ALJ to address" the issue of numerical significance.  *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004).

## V.  Conclusion

For the foregoing reasons, SSA's decision is **AFFIRMED**.

DATED: August __14__, 2015, at Denver, Colorado.


BY THE COURT:


    s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE